# STATE OF MICHIGAN

# COURT OF APPEALS

GARFIELD MART, INC.,

        Petitioner-Appellant,

v

DEPARTMENT OF TREASURY,

        Respondent-Appellee.

FOR PUBLICATION
August 8, 2017
9:05 a.m.

No. 333094
Tax Tribunal
LC No. 14-005162-R

Before: CAVANAGH, P.J., and METER and M. J. KELLY, JJ.

PER CURIAM.

Respondent, Michigan Department of Treasury, conducted an audit of petitioner, Garfield Mart, Inc.'s, sales tax return for tax years 2007 through 2011. As a result of the audit, the Department discovered that Garfield Mart had under-reported its sales resulting in a tax deficiency, and the Department issued Garfield Mart a Final Assessment for $236,591.25, including penalty and interest. Garfield Mart appealed the assessment to the Michigan Tax Tribunal, alleging that its sales of certain prepaid wireless calling arrangements were not subject to sales tax under MCL 205.52(2)(b) of the general sales tax act (GSTA), MCL 205.51 *et seq*., and that the audit was inaccurate. The Tribunal disagreed and entered a Final Opinion and Judgment in favor of the Department. Garfield Mart now appeals by right. For the reasons stated in this opinion, we affirm in part, reverse in part, and remand for further proceedings.

## I. BASIC FACTS

Garfield Mart is a gas station and convenience store that sells gas, cigarettes, lottery tickets, phone cards, groceries, and other miscellaneous items. Relevant to this dispute, Garfield Mart also sells "wireless calling arrangements" for prepaid cellphones, including "PINless top-up minutes" and electronic personal identification numbers (EPIN). Generally, PINless top-up minutes allow an individual to automatically add minutes to a prepaid cellphone via wireless download upon completion of payment, whereas an EPIN customer refills minutes on a prepaid cellphone only after entering a PIN into the cellphone. Garfield Mart is able to provide these services to its customers through a "PayGo prepaid system," which is essentially an electronic interface provided to Garfield Mart by Marceco Ltd. Under its contract with Marceco, Garfield Mart sells these wireless calling arrangements to customers and retains a 5 to 10 percent commission on the sale. Because this system is entirely electronic, no traditional phone cards are necessary.

To purchase PINless top-up minutes, a customer gives his cellphone number to the cashier, who in turn enters that number and the amount of the purchase into a credit-card-type terminal. After the clerk presses "enter," the terminal prints out a receipt reflecting the transaction amount and a reference number is also on the receipt. The additional minutes purchased are then wirelessly downloaded to the customer's cellphone and are available immediately. The receipt is given to the customer, who may need the reference number in the event there is a problem with the service.

Some of Garfield Mart's customers using the Marceco service elect to purchase an EPIN as opposed to the PINless top-up. In these instances, a receipt is printed showing the details of the transaction and also including a PIN number and directions on how to use the PIN. To access the additional purchased minutes, the customer must dial a 1-800 number and enter the PIN. Garfield Mart does not store these PIN numbers electronically at the store; rather, the Marceco terminal generates the PIN number upon purchase and it is delivered via the internet and printed on the receipt provided to the customer.

The Department conducted an audit of Garfield Mart's reported sales tax for the July 2007 through June 2011 tax years. Because Garfield Mart failed to maintain adequate records of its sales, the Department applied an indirect sampling methodology by which it estimated Garfield Mart's sales for the audit period using the best information available over a three-month period. The audit revealed that Garfield Mart had under-reported its sales of merchandise (cigarettes and general taxable items) and the wireless calling arrangements, and had over-reported its deductions to food. After adjusting for these deficiencies, the Department determined that Garfield Mart owed $178,463 in unpaid sales tax.

Garfield Mart contested the audit results by requesting an informal conference before the Department, asserting in part that the gross sales of the wireless calling arrangements are not taxable. The Department disagreed, positing that such sales are taxable under MCL 205.52(2)(b), which states that the general sales tax applies to "[t]he sale of a prepaid telephone calling card or a prepaid authorization number for telephone use, rather than for resale, including the reauthorization of a prepaid telephone calling card or a prepaid authorization number."

The hearing referee agreed, in part, with Garfield Mart and issued an Informal Conference Recommendation concluding that under MCL 205.52(2)(b) the EPIN transactions are taxable while the PINless top-up transactions are not taxable. Notwithstanding the hearing referee's recommendation, the Department issued a Decision and Order of Determination levying sales tax on both wireless calling arrangements. Consistent with this decision, the Department then issued a Final Assessment against Garfield Mart for a net tax liability of $178,463. The Final Assessment also included a negligence penalty of $17,847 and interest in the amount of $40,281.25, for a total bill of $236,591.25.

Garfield Mart filed an appeal before the Michigan Tax Tribunal, alleging that no sales tax was due, in part, because it merely receives commissions from Marceco and PINless top-up services are not taxable under the GSTA. An administrative law judge (ALJ) held a hearing. Garfield Mart presented a single witness, its store manager, Aved Ahmad. Ahmed testified to the general nature of the PINless top-up and EPIN sales. He further clarified that Garfield Mart did not sell any telephone calling cards, which he characterized as a plastic card that contains a

PIN, which is uncovered by scratching the back of the card. He explained that the owner then uses the PIN to access the purchased telephone service associated with the PIN each time the customer wishes to use the service.

The Department presented the testimony of its auditor, Sarah Johnson, who explained the audit methodology. Johnson said that although she requested documentation from Garfield Mart for the sample period, February through March 2011, she never received any inventory reports, general ledgers, purchase spreads, or "Z-tapes," which record daily sales at the cash register. To verify Garfield Mart's sales in the absence of Z-tapes, Johnson used Garfield Mart's purchases (of merchandise, cigarettes, etc.), applied a "mark-up" to the purchases to arrive at "projected sales," and compared that number to the sales that Garfield Mart actually reported. As a result of the audit, Johnson found that Garfield Mart under-reported sales and over-reported deductions. She testified that adjustments were made to both merchandise (which included cigarettes and general taxable items) and the wireless calling arrangements, as well as to the food deduction.

At the conclusion of the evidence, Garfield Mart argued that the PINless top-up sales were not subject to sales tax because no calling card or PIN is used and further that the EPIN sales were not subject to sales tax because the EPIN technology did not exist when the statute was enacted. Garfield Mart also asserted that the Department sampling method was faulty; more specifically, it asserted that the adjustment for food allowance used an inconsistent methodology and that fluctuations in inventory and cigarette rebates were not properly accounted for. The Department countered that both PINless top-up sales and EPIN sales are taxable, pointing out that in both instances, the customer is "re-authorizing an existing account of credit balance for prepaid telephone use." With respect to the accuracy of the audit, the Department argued that the audit was based on the best evidence available and that Garfield Mart had not submitted any evidence showing that the audit was inaccurate.

Thereafter, the ALJ entered a Proposed Opinion and Judgment affirming the Final Assessment. In its factual findings, the ALJ found that "[t]he purported 'receipt' issued by the MARCECO terminal was a paper prepaid telephone card evidencing the type of transaction (i.e., top-up or EPIN), which was utilized to enforce the top-up transactions, if necessary, or finalize the EPIN transactions[,]" and that Garfield Mart "was responsible for the payment of sales taxes on the top-up and EPIN transactions." In its conclusions of law, the ALJ framed the issue as whether the wireless calling arrangements "resulted in the sale of prepaid telephone calling cards, prepaid authorization numbers, or the reauthorization of prepaid authorization numbers" such that they are subject to sales tax under MCL 205.52(2)(b). The ALJ, relying on dictionary definitions, construed "prepaid telephone calling card" as "a piece of paper, cardboard, or plastic given to a customer in exchange for money that contains information that can be used for telephone calls or telephone service (i.e., minutes)." The ALJ then reasoned that the PINless top-up and EPIN transactions fall within this definition because the underlying transactions involve "the purchasing of prepaid calling services or, more specifically, the purchasing of minutes to allow further use of the prepaid cellular telephone utilized to complete the transaction[.]" The ALJ also held that the transactions resulted in the reauthorization of calling services, stating:

Notwithstanding the recognition of these transactions as resulting in the issuance of paper prepaid telephone calling cards, it is also arguable that the transactions result in the reauthorization of a prepaid authorization number. More specifically, the customers are required to have a prepaid cellular telephone to complete each transaction, as the number assigned to or otherwise authorizing the use of that telephone must be inputted to effectuate the sale of additional minutes to that telephone. As such, the telephone number is a prepaid authorization number that is utilized for the purpose of reauthorizing the further use of that prepaid authorization number. [Footnotes omitted.]

With respect to Garfield Mart's claim that the Department's audit was inaccurate, the ALJ stated:

[Garfield Mart] did not submit to [the Department] all of the records it requested and the records submitted were incomplete and unreliable, particularly ·in light of [Garfield Mart's] failure to retain required source documentation (i.e., Z-tapes or, more specifically, daily sales receipts). As a result, [the Department] lacked necessary information to verify if [Garfield Mart] had collected the amount of required sales tax and the lack of such information justifies [the Department's] use of [Garfield Mart's] purchase invoices and the markups provided by [Garfield Mart's] representative (i.e., "the best information available") to determine the amount of [Garfield Mart's] liability. Although [Garfield Mart] could have offered the requested records, other business records, or test samples for admission to demonstrate that the audit or sampling was inaccurate, [Garfield Mart] did not offer such information or [Garfield Mart's] representative as a witness to explain why the requested records were not provided or, more importantly, how the records submitted were prepared and the basis of the discrepancy, if any, between the markups purportedly provided by [Garfield Mart] to its representative and the markups provided by the representative to [the Department], as [Garfield Mart's] representative was responsible for the preparation of those records and the providing of the information utilized in the audit. Rather, [Garfield Mart] offered as its sole witness its store manager and Mr. Ahmad's testimony and the few invoices submitted were insufficient for the Tribunal to determine what modifications, if any, should have been made to the assessment, particularly given the prima facie correctness of the audit.

Garfield Mart filed exceptions to the Proposed Opinion and Judgment arguing that the ALJ misconstrued the statutory language by characterizing the PINless top-up and EPIN transactions as the "'new' version of the phone card." Garfield Mart explained that the statute only applies to certain methods of delivering telephone services, mainly arrangements that require the user to input a code to access the purchased services.

The Tribunal, however, rejected this argument in its Final Opinion and Judgment, stating:

[T]he ALJ did not err in characterizing the receipts [Garfield Mart's] customers receive when they purchase cardless and PINless calling arrangements as the new version of the phone card, or in describing the scope of the statute to cover

"prepaid calling services" as [Garfield Mart] contends. MCL 205.52(2) imposes a tax upon the sale of prepaid telephone calling cards, reauthorization of prepaid telephone calling cards, prepaid authorization numbers for telephone use, and reauthorization of prepaid authorization numbers for telephone use. The Legislature's inclusion of "authorization numbers" evidences its intent to tax more than just the sale of tangible property, i.e., the cards. It clearly intended to tax the calling services associated with those cards, and with the referenced authorization numbers. Moreover, the receipts, as they stand with respect to the EPIN transactions, contain a PIN number that the customer inputs into his or her phone to obtain the add-on minutes purchased at [Garfield Mart's] store. Consequently, the only difference between these receipts and a standard prepaid calling card is that the latter is preprinted and held in a physical inventory. As noted in the admitted Marceco brochure, "Prepaid transactions started out in the 1990's with preprinted scratch-off cards with PIN numbers. Marceco jumped to the forefront of electronic PIN delivery in 2003 . . . ." Even assuming, however, that said receipts cannot be construed as prepaid telephone calling cards within the meaning of MCL 205.52(2), the PINs themselves clearly constitute prepaid authorization numbers for telephone use. Similarly, even assuming that the PINless transactions cannot be construed as prepaid telephone calling cards or prepaid authorization numbers due to their PINless nature, such transactions are properly considered reauthorizations of a prepaid authorization number. As noted in the Proposed Opinion and Judgment, customers are required to have a prepaid telephone to complete each top-up transaction, as the number assigned to or otherwise authorizing use of that telephone must be inputted into the MARCECO terminal to effectuate the sale of additional minutes to the telephone.

The Tribunal also rejected Garfield Mart's assertions that the audit was inaccurate, stating:

Because [Garfield Mart] failed to maintain complete daily sales records, [the Department] had authority to conduct an indirect audit to test the accuracy of its books and records. [Garfield Mart] had no right to choose the audit method employed by [the Department] and the assessment is prima facie correct; [Garfield Mart] bears the burden of proving by a preponderance of the evidence that it is incorrect in whole or in part, and it failed to submit adequate affirmative evidence establishing that [the Department's] audit was inaccurate. The few invoices submitted were insufficient to determine what, if any, modifications should have been made to the sample, and on the issue of markups, [Garfield Mart] did not offer its accountant as a witness to explain how the records were prepared or the basis of the discrepancy, if any between the markups provided by [Garfield Mart] to the accountant and those provided by the accountant to [the Department]. [Footnotes omitted.]

The Tribunal adopted the ALJ's findings of fact and conclusions of law in its Final Opinion and Judgment.

This appeal follows.

## II. GENERAL SALES TAX

### A. STANDARD OF REVIEW

Garfield Mart argues that the Tribunal erred by interpreting MCL 205.52(2)(b) to include PINless top-up minutes and EPIN transactions. It also argues that the Department's audit was inaccurate and should not have been used, and that the Tribunal erred by assessing the negligence penalty to the tax deficiency assessed for the PINless top-up minutes. "Review of a decision by the MTT is very limited." *Drew v Cass Co*, 299 Mich App 495, 498; 830 NW2d 832 (2013). Unless fraud is alleged, this Court reviews the tribunal's decision for a "misapplication of the law or adoption of a wrong principle." *Liberty Hill Housing Corp v City of Livonia*, 480 Mich 44, 49; 746 NW2d 282 (2008) (citation and quotation marks omitted). "The tribunal's factual findings will not be disturbed as long as they are supported by competent, material, and substantial evidence on the whole record." *Drew*, 299 Mich App at 499 (citation and quotation marks omitted). "Substantial evidence" is "more than a scintilla of evidence, although it may be substantially less than a preponderance of the evidence." *Leahy v Orion Twp*, 269 Mich App 527, 529-530; 711 NW2d 438 (2006) (citation and quotation marks omitted). This Court reviews de novo issues of statutory construction. *Drew*, 299 Mich App at 499.

### B. ANALYSIS

### 1. INTERPRETATION OF MCL 205.52(2)(B)

Under the GSTA, MCL 205.52(2)(b) provides:

> (1) Except as provided in section 2a, there is levied upon and there shall be collected from all persons engaged in the business of making sales at retail, by which ownership of tangible personal property is transferred for consideration, an annual tax for the privilege of engaging in that business equal to 6% of the gross proceeds of the business, plus the penalty and interest if applicable as provided by law, less deductions allowed by this act.

> (2) The tax under subsection (1) also applies to the following:

> * * *

> (b) The sale of a prepaid telephone calling card or a prepaid authorization number for telephone use, rather than for resale, including the reauthorization of a prepaid telephone calling card or a prepaid authorization number.

No Michigan caselaw has interpreted the meaning of this provision. When interpreting statutory language, this Court's goal is to discern the Legislature's intent. *One's Travel, Ltd v Mich Dep't of Treasury*, 288 Mich App 48, 54; 791 NW2d 521 (2010). The best indicator of that intent is the plain and ordinary language used. *Id*. In construing a statute, the Court must read the language as a whole, giving meaning to each word in the context of the statute. *Green v Ziegelman*, 282 Mich App 292, 301-302; 767 NW2d 660 (2009). If the language is unambiguous, then the language must be applied as written. *One's Travel, Ltd*, 288 Mich App at 54. Further, tax statutes are not to be extended by implication and are to be construed against the

-6-

taxing authority if an ambiguity exists. *Mich Bell Tel Co v Dep't of Treasury*, 445 Mich 470, 477; 518 NW2d 808 (1994).

The language of MCL 205.52(2)(b) is unambiguous. Under this provision, only the sale of a "prepaid telephone calling card" or a "prepaid authorization number for telephone use," or the "reauthorization" of either of the foregoing is subject to sales tax. Therefore, to be subject to the sales tax, the EPIN and PINless top-up transactions must fall within the meaning of any of these statutory terms.

The statute does not define "prepaid telephone calling card" or "prepaid authorization number for telephone use." This Court may rely on dictionary definitions to discern the ordinary meaning of language used. *Ford Motor Co v Dep't of Treasury*, 496 Mich 382, 394; 852 NW2d 786 (2014). "Calling card" is defined as "a card *displaying a number* that can be used to charge telephone calls to a single account regardless of where the calls are placed." Meriam Webster's Collegiate Dictionary (11th ed) (emphasis added). The statute specifies that the calling card is "prepaid," indicating that the access number on the card contains a certain amount of minutes that have already been paid for, as opposed to a pay-as-you-go system. See Meriam Webster's Collegiate Dictionary (11th ed) (defining "prepay" as "to pay or pay the charge on in advance"). And, as commonly understood in the retail and telecommunications industry, such calling cards traditionally contain the information pertinent to the telecommunications services on a small rectangular scratch-off card (typically made of some stiff material that is the size of a credit card), where a PIN for accessing the service is revealed by scratching the back of the card. See generally Meriam Webster's Collegiate Dictionary (11th ed) (defining "card," such as credit cards, as "a flat stiff usu. small and rectangular piece of material (as paper, cardboard, or plastic) usu. bearing information"). Indeed, Garfield Mart presented testimony supporting this industry understanding of the term "telephone calling card" as a plastic scratch-off card containing a PIN necessary to access the prepaid minutes. The Department presented no contrary evidence and fails to point to any statutory language indicating that a "prepaid telephone calling card" is anything other than a credit-card-sized-stiff card with a PIN.

The statute also does not define "prepaid authorization number for telephone use." However, like a calling card, this mechanism for accessing phone services uses a number, i.e., an authorization number. This number, as indicated by the Legislature's use of the preposition "for," is used for the purpose of accessing telephone services. See Meriam Webster's Collegiate Dictionary (11th ed) (defining "for" as "a function word to indicate purpose"). And, the term "authorization," evokes the act of authorizing or of giving the power or authority to do something—which in the context of the statutory language here—is the power to access the prepaid telephone account. See Meriam Webster's Collegiate Dictionary (11th ed) (defining "authorization"). Taking these terms together, a "prepaid authorization number for telephone use" is a number representing a prepaid account used by the owner to access the purchased telephone services. Given the foregoing, it is clear that the Legislature, when MCL 205.52(2)(b) is read as a whole, intended to tax the sale of both prepaid tangible (calling cards) and intangible authorization numbers for telephone services, as well as the reauthorization of those numbers.

Here, neither the PINless top-up nor the EPIN calling arrangements are "telephone calling cards" as that term is used in the statute. Neither of these prepaid calling arrangements involves the sale of scratch-off plastic or credit-card-type calling cards that contain a pre-printed

-7-

authorization number that represents the minutes purchased. The Tribunal's conclusion that these calling arrangements constitute such calling cards was error and contrary to the plain and ordinary meaning of the term "prepaid telephone calling card." Indeed, by holding that the instant transactions are the "new" calling card, the Tribunal extended the tax statute by implication, running afoul of the principle that tax statutes are to be given a practical construction because taxing is a practical matter. See *Mich Bell Tel Co*, 445 Mich at 478.

This conclusion does not end our analysis because these wireless calling arrangements may be subject to sales tax if they constitute the sale of a "prepaid authorization number for telephone use" or, alternatively, the "reauthorization" of a prepaid authorization number. We conclude that an EPIN transaction is the sale of a prepaid authorization number for telephone use. When a customer purchases an EPIN, he or she receives a PIN on the receipt that must be entered on the customer's cellphone in order to access the telephone services associated with the PIN. Because the EPIN represents a prepaid account used by the owner to access the purchased telephone services associated with the EPIN, it falls within the definition of prepaid authorization number. It follows that the sale of an EPIN is taxable under MCL 205.52(2)(b).

However, the sale of a PINless top-up is not subject to sales tax under MCL 205.52(2)(b). When Garfield Mart sells a PINless top-up, its customer does not purchase any number representative of the account purchased that is used to access the purchased telephone service. Instead, the additional minutes are downloaded instantly to the customer's cellphone upon purchase; no authorization number or PIN is necessary to access the purchased telephone services. Stated differently, a purchaser of a PINless top-up purchases additional prepaid telephone services without any concomitant purchase of an authorization number necessary to access the purchased service. Because no sale of a prepaid authorization number occurs when a customer purchases a PINless top-up, the sale is not taxable under MCL 205.52(2)(b).

The Department's and the Tribunal's contrary interpretation of the statute is unpersuasive. First, the Tribunal's characterization of the reference number on the PINless top-up receipt as a PIN is not supported by the record. There is no dispute that the reference number is not used to access the prepaid telephone services, and that it is instead only relevant in the event there is a technical problem with the service. As such, the reference number is not a prepaid authorization number as that term is used in the statute, and is more akin to a confirmation number that a customer receives to evidence an electronic sale.

Likewise, the Tribunal's conclusion that a PINless top-up transaction is a reauthorization of a prepaid authorization number strains credulity. In support, the Tribunal reasoned that a customer's prepaid cell phone number is an authorization number and entering it into the terminal to complete the top-up transaction constitutes a reauthorization. A prepaid cellphone number, however, is not and cannot reasonably be characterized as a prepaid authorization number for telephone use. Rather, a prepaid cellphone number is a number assigned to that phone to call that phone. Simply because that number is used in the top-up transaction to add minutes does not transform it into a prepaid authorization number.

Certainly the Legislature, in enacting MCL 205.52(2)(b), intended to tax the sale of telephone services affiliated with the sale of authorization numbers, whether contained on a physical card or not. Yet, the instant sales of PINless top-up are not accompanied by any

authorization number necessary to access the service. If the Legislature wants to tax the sale of these PINless services, then it must amend the statute to do so. Under the present language of MCL 205.52(2)(b), PINless top-up sales are not subject to sales tax because they do not involve the sale of a telephone calling card or authorization number for telephone use, nor do they involve the reauthorization of a telephone calling card or authorization number. Accordingly, we affirm the Tribunal with respect to the EPIN transactions, but reverse with respect to the PINless top-up transactions.

## 2. AUDIT ACCURACY

Garfield Mart also asserts that the audit conducted by the Department was inaccuracte. Under MCL 205.68(1), "[a] person liable for any tax imposed under this act shall keep in a paper, electronic, or digital format an accurate and complete beginning and annual inventory and purchase records of additions to inventory, complete daily sales records, receipts, invoices, bills of lading, and all pertinent documents in a form the department requires." In the event the taxpayer fails to preserve or maintain these records as prescribed in MCL 205.68(1) and the Department believes outstanding tax is due, "the department may assess the amount of the tax due from the taxpayer based on an indirect audit procedure or any other information that is available or that may become available to the department." MCL 205.68(4). MCL 205.68(4) further provides:

> That assessment is considered prima facie correct for the purpose of this act and the burden of proof of refuting the assessment is upon the taxpayer. An indirect audit of a taxpayer under this subsection shall be conducted in accordance with 1941 PA 122, MCL 205.1 to 205.31, and the standards published by the department under section 21 of 1941 PA 122, MCL 205.21, and shall include all of the following elements:
>
> (a) A review of the taxpayer's books and records. The department may use an indirect method to test the accuracy of the taxpayer's books and records.
>
> (b) Both the credibility of the evidence and the reasonableness of the conclusion shall be evaluated before any determination of tax liability is made.
>
> (c) The department may use any method to reconstruct income, deductions, or expenses that is reasonable under the circumstances. The department may use third-party records in the reconstruction.
>
> (d) The department shall investigate all reasonable evidence presented by the taxpayer refuting the computation.

On appeal, Garfield Mart argues that the Tribunal erred by approving respondent's indirect sampling method because respondent failed to follow its audit guidelines. Garfield Mart, however, cites no law indicting that the failure to strictly adhere to respondent's internal audit guidelines constitutes error requiring reversal. Moreover, Garfield Mart even concedes that it has no right to demand a particular audit method due to its failure to provide respondent with adquate records of its sales. See *By Lo Oil Co v Dep't of Treasury*, 267 Mich App 19, 42-43; 703 NW2d 822 (2005). Additionally, Garfield Mart points to no affirmative evidence

demonsrtrating that the audit was, in fact, actually inaccurate so as to rebut its presumptive validity.

Even assuming that failure to follow internal audit guidelines could constitute evidence of an inaccurate audit, Garfield Mart's arguments fail. First, with respect to the adjustment to the non-prepared food deduction, Garfield Mart contends that the Department did not use the same methodology as that used for "calculating the sales tax deficiencey for non-exempt products" as required by the audit manual. Johnson, the Department's auditor, however, testified that the method used for the non-prepared food deduction was consistent with respondent's published guidance. Second, Garfield Mart contends that the Department should not have subtracted rebates received from the projected purchases of cigarettes; however, inclusion of those rebates in the projected sales price would increase Garfield Mart's sales tax liability, and Garfield Mart does not otherwise explain why subtraction of the rebates results in an innacurate assessment for cigarette sales. Next, Garfield Mart argues that the audit is innacurate because Johnson failed to account for breakage and theft of merchandise, which would have reduced its tax liability. Johnson, however, testified that there was no evidence of theft during the sampling period. Finally, Garfield Mart claims that the Department should have accounted for increases in inventory during the sampling period, given that not all merchandise was sold during that time frame. While Johnson testified that no such adjustments were made, the audit manual does not require such adjustments and Garfield Mart did not provide the Department with evidence that would have supported such an adjustment because Garfield Mart failed to provide its inventory logs.

In sum, given Garfield Mart's failure to maintain adequate sales records and to provide those records to the Department, it had no right to insist upon a particular audit methodology, and Garfield Mart has otherwise failed to rebut the presumption that the audit was accurate.

## 3. NEGLIGENCE PENALTY

Finally, Garfield Mart argues that the negligence penalty should not apply to the PINless top-up minutes. In the Final Assessment, the Department imposed a ten percent negligence penalty for Garfield Mart's failure to remit the sales taxes for the tax years at issue. In the Proposed Opinion and Judgment, the ALJ affirmed the imposition of the penalty, stating:

> As for the levied penalty, Petitioner's claim that it was not responsible for the payment of sales taxes on the top-up or EPlN transactions or that it was not aware that it was required to maintain complete daily sales records is neither supported by the record nor justifies a waiver of the levied penalty.

In the Final Opinion and Judgment, the Tribunal affirmed the penalty without comment.

MCL 205.23(3) requires the imposition of a penalty in the event that a tax deficiency is due to the taxpayer's negligence. Negligence, for purposes of imposing such a penalty, "is the lack of due care in failing to do what a reasonable and ordinarily prudent person would have done under the particular circumstances." Mich Admin Code R 205.1012. Whether a taxapyer was negligenct is determined on a case-by-case basis, but the "standard for determing negligence is whether the taxpayer exercised ordinary care and prudence in preparing and filing a return and

paying the applicable tax in accordance with the statute." Rule 205.1012. As such, if the taxpayer "demonstrates to the satisfaction of the department that the deficiency . . . was due to reasonable cause, the department shall waive the penalty." MCL 205.23(3). Here, because the PINless top-up sales were not taxable under MCL 205.52(2)(b), the negligence penalty must be adjusted to reflect that fact on remand.

We affirm in part, reverse in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Patrick M. Meter
/s/ Michael J. Kelly

-11-